**STATE OF CALIFORNIA et al. v. UNITED STATES et al.**

**CITY OF OAKLAND v. SAME.**

Nos. 22000, 22002.

District Court, N. D. California, S. D.
Aug. 20, 1942.

Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal. (Carl F. Farbach, Sp. Counsel, and John B. Jago, Atty., United States Maritime Commission, both of San Francisco, Cal., of counsel), for the United States and another.

Earl Warren, Atty. Gen. of State of California, and Lucas E. Kilkenny, Deputy Atty. Gen., for petitioner State of California and another.

W. Reginald Jones, Port Atty., City of Oakland, of Oakland, Cal., Lillick, Geary, Olson & Charles, Ira S. Lillick, and Joseph J. Geary, all of San Francisco, Cal., for intervener Encinal Terminals.

Morrison, Hohfeld, Foerster, Shuman & Clark and F. C. Hutchens, all of San Francisco, Cal., for intervener Parr-Richmond Terminal Corporation.

Graham & Morse, of San Francisco, Cal., for intervener Howard Terminal.

Before HEALY, Circuit Judge, and ST. SURE and ROCHE, District Judges.

HEALY, Circuit Judge.

Following its investigation of certain practices of the petitioners and eighteen other terminals in the San Francisco Bay area, the United States Maritime Commission made an order which the petitioners here seek to enjoin.[1] Petitioners' suits have been consolidated, and a three-judge court assembled pursuant to 28 U.S.C.A. § 47.

The Maritime Commission's hearing was conducted before a trial examiner who made recommendations later put into effect by the order. The Commission found that there is a lack of uniformity in the rules and practices of the terminals in the Bay area in regard to free-time allowance, and that the manner in which they are applied affords opportunity for unequal treatment of shippers; also, that such rules and practices are unduly prejudicial and preferential in violation of § 16, and unreasonable in violation of § 17 of the Shipping Act,

---

[1] The Commission's order is reported in 2 U.S.M.C. 588. Petitioners' suits are brought pursuant to 46 U.S.C.A. § 830 and 28 U.S.C.A. § 46.

1916, as amended.[2] It found further that the regulations and practices in respect of demurrage and storage charges are lacking in uniformity, and that, as a whole, the terminals are furnishing wharf storage services at non-compensatory rates, resulting in the unequal treatment of users and nonusers of such services; likewise, that these rules and practices are in violation of §§ 16 and 17 of the Act.

As defined by the Commission, free time is the period allowed for the assembling of cargo upon, or its removal from the wharves. Wharf demurrage is the charge accruing on cargo left in possession of the te ·minal beyond the free-time period. Demurrage is a penalty charge designed to force the cargo off the wharves and thereby clear them for other traffic. In lieu of demurrage, or upon the expiration of the demurrage period, a storage charge may be assessed at a lower rate. As a remedy for the existing abuses, the Commission prescribed a table of free-time periods, the terminals being ordered to abstain from allowing longer periods than those prescribed.[3] As to demurrage and storage, it prescribed: (a) a penalty charge of 5¢ per ton per day upon cargo remaining beyond the free-time period and not declared for storage, with the further provision that when cargo is not declared for storage by the fifth day it shall automatically go into storage; (b) a storage charge, varying with different commodities, and based on a fifteen-day period or fraction thereof;

and (c) a handling charge, likewise varying with different commodities, to be assessed when cargo goes into storage. The terminals were ordered to abstain from assessing demurrage and storage charges at less than the prescribed rates, but the order was without prejudice to the establishment of higher rates when they were justified and it did not require the reduction of any higher rates then in effect. There was a further requirement that the terminals file with the Commission and keep open to public inspection schedules showing all the rates and charges for the furnishing of wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water.

The rates and regulations imposed appear to be identical with those prescribed by the California State Railroad Commission for private terminals in the Bay area.[4] The latter order grew out of the State Commission's investigation, commenced in 1935, of the "chaotic" conditions prevailing in the terminals. The major problems, said the State body, were "the inadequacies of the revenues of the terminal operators, the diversion of tonnage through absorptions, and the existence of discriminatory rates between various users of the services." A study of terminal operations and revenues was made by agents of the State Commission and the results were set out in a preliminary and a final report, referred to as the Edwards-Differding reports. Based upon their analysis of the

---

[2] Section 16, 46 U.S.C.A. § 815, provides in part: "It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—

"First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

Section 17, 46 U.S.C.A. § 816, provides in part: "Every such carrier and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the board finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe,

and order enforced a just and reasonable regulation or practice."

[3] The table of prescribed free-time periods, exclusive of Sundays and holidays, is as follows:

| | In-bound | Out-bound |
|---|---|---|
| | Days | Days |
| Coastwise and Inland Waterway | 5 | 5 |
| Intercoastal | 5 | 7 |
| Foreign | 7 | 7 |
| Transshipment | 10 | 10 |

This schedule is without prejudice to a longer period, not in excess of 21 days, on petroleum or products thereof, destined to trans-Pacific ports; and without prejudice to the establishment of reasonable rules and regulations in connection with free-time allowances.

[4] Decision No. 29,171, Case No. 4090, Railroad Commission of the State of California (1936).

cost of rendering the various services, and considering also such factors as competition between terminals and the ability of the traffic to pay, Edwards and Differding recommended the rates and regulations subsequently adopted. Their studies did not extend to the State and municipal terminals, since the State Commission has no jurisdiction over them; and, owing to competitive conditions, the State Commission's order was expressly conditioned upon the voluntary adoption of similar measures by the publicly owned terminals. It appears that all of the terminals, both public and private, have adopted the recommendations of the State Commission as to toll, dockage, and service charges, but not those relating to free time, demurrage, and storage. The Edwards-Differding reports were admitted as evidence in the proceeding before the Maritime Commission, and there was also testimony by Differding. It is conceded that these reports form the basis of the order here under attack.

Both petitioners are public agencies. The members of the Board of State Harbor Commissioners for San Francisco Harbor are appointed by the governor. The function of the Board is to provide the facilities for handling freight and passengers on the San Francisco waterfront. It controls the piers and wharves, all of which are owned by the State, and it operates the Belt-Line terminal railroad. The board assigns pier space to the various steamship lines, giving them a preferential use of the piers, for which it charges a rental.[5] It also collects dockage on vessels and tolls on cargo, as well as demurrage and storage charges. All revenues from handling, loading, and accessorial services are collected and retained by the assignees. The Board is not authorized to engage in warehousing, nor is it authorized to make a profit from its operations. It is, however, required to collect sufficient revenue to enable it to perform its duties and pay the principal and interest on its bonds.[6]

Oakland, a municipal corporation, operates several terminals directly, and others it leases to private operators. The facilities are managed and the rates fixed by the Board of Port Commissioners of the Port of Oakland. Deficits in operation are made up by taxation.[7]

1. Little attention need be given the first argument advanced by the petitioners, namely, that their terminal operations are sovereign or governmental in character, hence are constitutionally immune from Federal control. We do not inquire whether the functions performed are governmental or proprietary, for in either event they are subordinate to the power of Congress to regulate interstate commerce. United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567.[8] The petitioners contend that since they do not actually handle the cargo which passes through the terminals they are not engaged in "commerce." But their terminal activities bear immediately and substantially upon the flow of goods in interstate and foreign commerce, and it is immaterial that they are not themselves engaged in commerce, as such, or that their activities may be wholly intrastate. United States v. Darby, 312 U.S. 100, 118, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; United States v. Wrightwood Dairy Company, 315 U.S. 110, 121, 62 S.Ct. 523, 86 L.Ed. ——.

2. The provisions of §§ 16 and 17 of the Act apply to a common carrier by water or "other person subject to this chapter." The latter phrase is defined in § 1, 46 U.S.C.A. § 801, as meaning "any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water." The same section further states that "the term 'person' includes corporations, partnerships, and associations, existing under or authorized by the laws of the United States, or any State, Territory, District, or possession thereof, or of any foreign country."

The major contention advanced appears to be that the Shipping Act of 1916 does not apply to the petitioners in that neither of them is a "person" as that term is de-

---

[5] Two of the piers are assigned to private operators, namely, Golden Gate Terminals and State Terminal Company.

[6] Sections 3080 and 3084, Harbors and Navigation Code of California, 1937, St. Cal.1937, p. 856.

[7] Success of the terminal operations of Oakland is measured by the industrial development of the city.

[8] See, also, Parkersburg & Ohio River Transportation Company v. Parkersburg, 107 U.S. 691, 701, 2 S.Ct. 732, 27 L.Ed. 584; State of California v. Anglim, 9 Cir., 129 F.2d 455.

fined in the Act. Various reasons are marshaled in support of the contention. It is said that since Congress was at pains to specify the particular entities embraced by the term "person" it must have intended to exclude those not mentioned; · that it is a canon of construction that a sovereign is presumptively not bound by its own statute unless specifically named in it; that petitioners are not to be classed as "other persons" subject to the Act for the reason that they are not "carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water," more specifically, that they are not carrying on a business, and that, assuming they are, it is not in connection with a common carrier by water.

It is plain that the statutory enumeration of the entities falling within the term "person" is not exclusive, and was not intended to be so. If it were otherwise, the curious result would follow that even an individual is not a "person" within the intendment of the Act. In State of Georgia v. Evans, 62 S.Ct. 972, 973, 86 L. Ed. ——, decided April 27, 1942, the court held that the term "person," as similarly defined in the Sherman Act, includes a state. The court observed that whether the word "person" or "corporation" includes a state "depends upon its legislative environment." Congress knew that a substantial proportion of the wharfinger service of the country is provided by public agencies. The salutary purposes intended to be effected by the Shipping Act would largely be defeated if it were to be held that such agencies are outside the scope of the legislation, as witness the dilemma of the California State Railroad Commission in its attempt to deal with the terminal problem in the Bay area. Moreover, resort to the legislative history of the Act affords some evidence that it was the intent of Congress to make public terminals subject to regulation.[9]  As to the canon of construction relied on, the Supreme Court in United States v. California, supra [297 U.S. 175, 56 S.Ct. 425, 80 L.Ed. 567], observed that "the presumption is an aid to consistent construction of statutes of the enacting sovereign when their purpose is in doubt, but it does not require that the aim of the statute fairly to be inferred be disregarded because not explicitly stated." The State of California is not, incidentally, the enacting sovereign in this instance.

It would hardly be consonant with good sense to believe that the petitioners are not in the "business" of furnishing terminal facilities merely because, as is argued, the governing statute forbids or does not contemplate that they make a profit. The phrase "carrying on the business" has not so narrow a connotation as that. Indeed, the State law is in disagreement with the contention insofar as it is made by the Board of State Harbor Commissioners. Section 1731 of the Harbors and Navigation Code of California, 1937, provides that the president of the Board "shall supervise the conduct of the dock system, the State Belt Railway, and all other departments of the harbor business." And see Denning v. State, 123 Cal. 316, 321, 55 P. 1000, 1001, in which the California Supreme Court observed that the Board is authorized to conduct the "business of a wharfinger." It is equally plain that the business of petitioners is conducted "in connection with a common carrier by water." It is inadmissible to suppose that this phrase limits the definition of "other persons" to those whose operations form part of the act of water transportation for the result would follow that no persons are affected other than common carriers by water. We need not labor the point. The statutory verbiage seems clear enough as it stands. The petitioners are plainly within the definition of those furnishing terminal facilities in connection with common carriers by water.

---

9 During the discussions in the Committee of the Whole House on H.R. 15455, which later became the Shipping Act, reference was made to the fact that large sums of money had been invested in municipal docks by such cities as New York, Seattle, San Francisco, and Los Angeles, and the question was asked whether it was the intention of the bill to take away the control of these municipal wharves from the cities which had constructed them. To this question the chairman of the Committee on the Merchant Marine and Fisheries (the committee in charge of the bill) made the following reply: "Not at all; only to prevent unjust discrimination between shippers. If they do exercise such discrimination, there is no reason why they should not be amenable to the law as well as a private person." 53 Cong.Rec. 8276.

3. We turn to the contention that the order exceeds the authority conferred upon the Commission by §§ 16 and 17.

The order, insofar as it relates to free time, is clearly valid. The allowance of free time is a "regulation or practice" within the contemplation of § 17, and the petitioners do not attack as unreasonable the maximum free-time periods fixed. The periods prescribed are substantially the same as those already in effect on the San Francisco waterfront; and Oakland's assistant port manager testified that they are reasonable and proper. All parties agree that the question of free time is tied in with the need to keep the transit sheds clear for the purpose of cargo movement. Moreover, lack of uniformity in the practices of particular terminals in regard to extensions of the free-time period results in the giving of undue preferences and advantages, in violation of § 16.[10]

■ But the power of the Commission to establish minimum wharfage rates stands on a somewhat different footing. The Commission disavows authority to fix the rates of the petitioners. What it does lay claim to is the authority and the responsibility of preventing discriminatory and unreasonable practices, and it says that it is "not to be deterred by the incidental effect of its action upon rates." In a sense, the whole problem may be said to grow out of the uncontrolled practices regarding free time. There can be no question but that the furnishing of storage at nominal rates, upon the expiration of the free-time period, amounts substantially to an extension of the free time.[11] The difference is merely one of degree. It is difficult to see how the discriminatory and unreasonable practices found to be existent can be corrected unless the terminals are ordered to put a platform beneath the charges imposed where goods are left beyond the free-time period. Cf. Merchants Warehouse Co. v. United States, 283 U.S. 501, 513, 51 S.Ct. 505, 75 L.Ed. 1227. The rates approved, it should be remembered, were expressly found to be not in excess of cost.

■ Under § 16 the Commission has power to prevent discrimination between shippers "in any respect whatsoever," and this power has been held to extend to matters of rate discrimination. Compagnie Generale Transatlantique v. American Tobacco Co., 2 Cir., 31 F.2d 663, 666, certiorari denied 280 U.S. 555, 50 S.Ct. 16, 74 L.Ed. 611; Booth S.S. Co. v. United States, D.C.N.Y., 29 F.Supp. 221. But the present order does not stop with the requirement that all shippers who leave their goods on the wharves beyond free time shall be charged demurrage and storage at uniform rates; it goes further and prescribes the level below which those rates are not to fall. The discrimination said to justify the order is not between shippers who avail themselves of the storage services; it is between the users and nonusers of the service. As the report of the Commission states "the users of the wharf storage services are not providing their proper share of essential terminal revenues," and "a disproportionate share of this burden is being passed to users of other terminal services." The Commission further observed that "the practice of furnishing one service below cost has the tendency to prevent any downward revision of rates for other services however justified they may be."

Section 16 of the Shipping Act is substantially identical with § 3(1) of the Interstate Commerce Act,[12] 49 U.S.C.A. § 3(1), which has been held applicable to rate discrimination of the same character as that involved here. In Ex Parte No. 104, Part VI, Warehousing and Storage of Property by Carriers at Port of New York, 198 I.C.C. 134, 216 I.C.C. 291, and Id., 220 I.C.C. 102, the Interstate Commerce Commission held that the practice of certain railroads in furnishing storage to shippers at non-compensatory rates results in undue

---

10 In its findings the Commission states: "Under the stress of competition, most of the larger terminals, in cases of emergencies, extend the free time either to cover the additional number of days of delay to the vessel, or, in the case of Oakland, to such number of days as 'is warranted and equitable in each individual case,' according to the judgment of the Port Manager."

11 The Commission found that, while the demurrage rates of the San Francisco Board are designed to, and do, accomplish the purpose of clearing the piers for in-transit cargo, nevertheless, in order to be competitive, the Board provides a lower "bulkhead" storage rate for cargo not occupying essential transit space.

12 Cf. United States v. Tozer, C.C., 39 F. 904, 906.

prejudice to those shippers whose commercial practices do not permit of their placing their goods in storage, but require direct shipment from shipside to destination. The prejudice was found to extend to "all persons who are compelled to bear the carriers' transportation rates which are dissipated by their storage practices." 216 I.C.C. 291, 351. This administrative decision, involving § 3(1) of the Interstate Commerce Act, was upheld in Baltimore & Ohio Railroad Company v.. United States, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318, substantially on the grounds advanced by the Interstate Commerce Commission. While the case involved other sections of the Act as well as § 3(1), the holding appears to be that the former section, standing alone, would support the Commission's order. The important matter to be noted is that the discrimination discussed by the Supreme Court did not result from the failure of the railroads to treat all shippers alike, but from the fact that certain shippers were not in a position to take advantage of the non-compensatory warehousing service.

While we have considered we have not discussed all the arguments made by the petitioners in respect of the point, and we think it unnecessary to do so. For reasons already given we are of opinion that the order of the Commission in respect of minimum wharfage charges has support in § 16 of the Shipping Act, if not in § 17.

4. The Edwards-Differding studies did not extend to the petitioners' operations, but the record supports the inference that the petitioners' costs were not substantially less than the costs of other terminals in the Bay area. The studies did include the Howard, Encinal, and Parr-Richmond terminals in the East Bay area, as well as the two privately operated piers on the San Francisco waterfront, namely, Golden Gate Terminals and State Terminal Company. The rates recommended by the experts and adopted by the Commission were based on the lowest unit costs, both fixed and operating, of the terminals studied; and there is testimony that such costs have increased since the investigation. Under these circumstances, and in view of petitioners' failure to introduce any evidence tending to show that their costs were lower than those prevailing at the other terminals, we think the Commission was justified in concluding that the minimum rates prescribed were not above the petitioners' cost of rendering the service.

■ Oakland complains that the Commission should have considered only the out-of-pocket expenses incident to the rendition of the service, and should not have included, as it did, the fixed cost of providing floor space. But we believe that the determination of the proper cost basis should be left to the discretion of the Commission. Certainly we can not say that the formula adopted by it is unreasonable. Cf. Swayne & Hoyt, Ltd., v. United States, 300 U.S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659; Virginian Ry. Company v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463.

■ 5. The Board claims that the order is in conflict with § 9, Article I, of the Constitution, which provides that "no preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." Since the rates in certain of the Pacific Northwest ports are somewhat lower than those prescribed for the Bay area terminals, the order is said to bestow an unlawful preference on those ports. We note again, in passing, that the Maritime Commission's order is substantially identical with the order of the State's own regulatory body. Moreover, the conditions in the other ports are not shown to be the same. It is enough to say that the order does not affect the rates and practices of any terminal outside the Bay area. As said in Pennsylvania v. Wheeling & Belmont Bridge, 18 How. 421, 435, 15 L.Ed. 435, "what is forbidden is, not discrimination between individual ports within the same or different States, but discrimination between States." There is no discrimination of that character here.

■ Another contention is that the order is invalid for the reason that it gives an undue preference or advantage to the Northwest as a "locality," within the phraseology of § 16 of the Shipping Act. But the statute obviously refers to discrimination between shippers. The rates and regulations prescribed by the order are uniformly applicable to all localities which seek the use of petitioners' terminal facilities.

We find that the Maritime Commission had lawful authority to make its regulatory order, and that the same is valid. It is therefore ordered that petitioners' motion for a permanent injunction be denied and the proceedings dismissed, upon preparation of findings of fact and conclusions of law. Petitioners will pay costs.