CALIFORNIA ET AL. *v.* UNITED STATES ET AL.

NO. 20.

Argued December 6, 1943.—Decided January 3, 1944.

*Mr. Lucas E. Kilkenny,* Deputy Attorney General of California, with whom *Mr. Robert W. Kenny,* Attorney General, was on the brief, for appellants in No. 20. *Mr. W. Reginald Jones* for appellant in No. 22.

*Solicitor General Fahy,* with whom *Assistant Attorney General Shea,* and *Messrs. Valentine Brookes* and *K. Norman Diamond* were on the brief, for the United States and the United States Maritime Commission, appellees.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The United States Maritime Commission found that terminals along the commercial waterfront in the Port of San Francisco were engaged in preferential and unreasonable practices in that they allowed excessive free time and made non-compensatory charges for their services, all in violation of §§ 16 and 17 of the Shipping Act of 1916, as amended.[1] Accordingly, the Commission ordered the cessation of these proscribed practices, and in order to assure lawful practices it prescribed schedules of maximum

---

[1] Section 16, so far as here relevant, provides: "That it shall be unlawful for any common carrier by water, or other person subject to this Act, either alone or in conjunction with any other person, directly or indirectly—First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." c. 451, 39 Stat. 734, c. 581, 49 Stat. 1518, 46 U. S. C. § 815.

The pertinent portion of § 17 reads: "Every such carrier and every other person subject to this Act shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the commission finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice." c. 451, 39 Stat. 734, Ex. Ord. No. 6166, c. 858, 49 Stat. 1987, 2016, 46 U. S. C. § 816.

free time periods and of minimum charges to reflect the actual cost of services. 2 U. S. M. C. 588. Two of the terminal operators in the San Francisco Bay area were the State of California and the City of Oakland. They brought these proceedings to set aside the Commission's order in so far as it applied to them. A district court of three judges denied relief. 46 F. Supp. 474. The case is here on direct appeal under § 31 of the Shipping Act (c. 451, 39 Stat. 738, Ex. Ord. No. 6166, c. 858, 49 Stat. 1987, 2016, 46 U. S. C. § 830) in connection with the Urgent Deficiencies Act of 1913 (c. 32, 38 Stat. 220, 28 U. S. C. §§ 47 and 47a) and the Judiciary Act of 1925 (c. 229, 43 Stat. 938, 28 U. S. C. § 345 (4)). California and Oakland denied the power of the Commission to issue the kind of order that it did, and in any event they urged that the authority under which the Commission acted does not or, if it does, cannot constitutionally cover their operations.

The legal issues depend for their solution upon an understanding of the situation to which the Commission addressed itself—the circumstances as the Commission found them and the appropriate way of dealing with them. What follows is a rapid summary of a voluminous record.

Through its Board of State Harbor Commissioners, California provides facilities for the handling of freight and passengers on the San Francisco waterfront, under a statute which prohibits the Board from making charges beyond the cost of furnishing such facilities and administering them. California Harbors and Navigation Code §§ 3080, 3084. Pier and office space is assigned by the Board to various steamship lines, and charges fixed by the Board are collected by these assignees for the Board. Except at two piers, the assignees handle the cargo, but the Board employs a staff of men to check all cargo and vessel movements and collect its charges. Oakland, through its Board of Port Commissioners, operates

piers and terminals which, like those of California, are designed to accommodate vessels in coastwise, intercoastal, offshore, and foreign trade. Whether the facilities are operated by the City directly or leased to another, the City prescribes and collects the charges.

In thus providing facilities for water-borne traffic, Oakland and California have for many years competed with privately-owned terminals in San Francisco Bay. Cutthroat competition ensued, with the inevitable chaos following abnormally low rates. In an attempt to remedy the situation, the California Railroad Commission investigated the operations of terminals in San Francisco Bay, and, more particularly pertinent for present purposes, the prevalent discrimination among users of the terminal services. The conclusions from this inquiry were embodied in an order issued by the Railroad Commission in 1936. 40 Calif. R. R. Comm. Decisions 107. But publicly-owned terminals, and therefore those of California and Oakland, are not subject to the jurisdiction of the Railroad Commission. Since these public bodies operated the major portion of the dock facilities in the area, the Railroad Commission naturally found it impossible to order adjustments in the practices of the private terminals unless the competing public bodies agreed to make similar adjustments. The order of the Commission was so conditioned. California and Oakland acceded to the recommendations in some respects but failed to do so as to practices now to be described.

When cargo is brought to a wharf for shipment or removed to a wharf from a ship, it is the custom to allow a period of "free time" during which the cargo may rest on the wharf without charge. The length of the free time is fixed, broadly speaking, by determining the period reasonably necessary for the shipper to assemble or to remove his goods and for the ship to load or to discharge. When cargo is left on the wharf beyond the free time

period, a charge called "wharf demurrage or storage" is assessed. The Railroad Commission recommended free time periods shorter than was the practice of California and Oakland, and wharf demurrage charges greater in many instances than those collected by them. These recommendations California and Oakland rejected. This impasse, due to the immunity of California and Oakland from state regulation, was followed by the proceedings before the United States Maritime Commission which resulted in the order now before us. Extended hearings were held before the Commission's examiner, at which the principal witnesses were officials of the Board and Oakland and an expert of the Railroad Commission. After full submission of the controversy, the examiner made his report and findings. On exceptions to some of his findings, the issues were again thoroughly canvassed before the Commission, and on September 11, 1941, it made its order.

The Commission found that there was a marked lack of uniformity in the free time periods allowed by the various terminals, and that to the extent that appellants' free time allowances were greater than those recommended by the Railroad Commission they were unreasonable and led to discrimination against those persons who did not and could not use extended free time. After consideration of the cost studies submitted by its experts as well as of the data introduced by appellants, the Commission further found that appellants' demurrage charges were less than the cost of the services and the carrying charges of the facilities which furnished them. It concluded that unless those who took advantage of wharf storage supplied revenue sufficient to meet the cost of the service, the burden would be shifted to those who paid appellants for other terminal services, such as docking of vessels, loading and unloading, and transportation privileges over and through the terminals. Accordingly,

the Commission ordered appellants to cease and desist from allowing greater periods of free time than those found reasonable by the Railroad Commission, and to abstain from collecting wharf demurrage and storage rates less than those prescribed by the California authority for private terminals.[2]

Having found violations of §§ 16 and 17, the Commission was charged by law with the duty of devising appropriate means for their correction. It could have issued an order generally prohibiting further preferential and unreasonable practices, leaving the parties to translate such a generality into concreteness and to devise their own remedies. The Commission chose to do otherwise. It can hardly be suggested that the protection of the national interest in interstate and foreign commerce or even the convenience of the parties would, as a matter of sensible and economic administration, limit the Commission to such negative means of dealing with the evils revealed on this record in one of our greatest ports. Cf. *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 194. Explicit formulation of duties owed by a business subject to legal regulation is desirable if indeed not necessary. Only thus can it avoid the hazards of uncertainty whether its attempted compliance with an undefined requirement of law is in fact compliance. Neither industry nor the community which it serves is benefited by the explosion of intermittent lawsuits for determining the relative rights

---

[2] The City of Oakland asks this Court to determine whether the Maritime Commission properly found that § 15 of the Shipping Act required Oakland to submit certain lease agreements for the Commission's approval. c. 451, 39 Stat. 733, Ex. Ord. No. 6166, c. 858, 49 Stat. 1987, 2016, 46 U. S. C. § 814. The Commission's order does not appear to require such filing. If this be an inadvertent or clerical omission, since Oakland's objection is founded on its basic contention that it is not subject to the Shipping Act, we need not further consider this subsidiary question.

of conflicting interests. What more natural for the Commission, having found disobedience of the law against discriminatory and unreasonable practices, than to define the outer bounds of practices that would not be unreasonable nor discriminatory.[3] And so the Commission fixed a schedule of maximum free time and another schedule for avoiding discrimination through non-compensatory charges. It acted on authoritative information and fully canvassed testimony in fixing the minimum charges that would reflect cost. It was proper to choose the cost standard, because just as unreasonably long free time tends to be parasitic on rates for other services, non-compensatory demurrage results in the same mischief. Cf. *Baltimore & Ohio R. Co.* v. *United States,* 305 U. S. 507, 524.

Appellants' objection is that while §§ 17 and 18 specifically give the Commission rate-making power over common carriers by water,[4] no such power is given over those

---

[3] *Booth S. S. Co.* v. *United States,* 29 F. Supp. 221, is an object lesson. In that case, the order of the Maritime Commission as to the charges to be imposed after free time was in general terms. Attempted compliance with that order led to conflict, and the Commission found it necessary to undertake new proceedings and to issue a new, more definite order.

[4] The following are the rate provisions in §§ 17 and 18. Section 17: "That no common carrier by water in foreign commerce shall demand, charge, or collect any rate, fare, or charge which is unjustly discriminatory between shippers or ports, or unjustly prejudicial to exporters of the United States as compared with their foreign competitors. Whenever the commission finds that any such rate, fare, or charge is demanded, charged, or collected it may alter the same to the extent necessary to correct such unjust discrimination or prejudice and make an order that the carrier shall discontinue demanding, charging, or collecting any such unjustly discriminatory or prejudicial rate, fare, or charge." Section 18: "That every common carrier by water in interstate commerce shall establish, observe, and enforce just and reasonable rates, fares, charges, classifications, and tariffs, and just and reasonable regulations and practices relating thereto. . . . Whenever the commission finds that any rate, fare, charge, classification,

who, like California and Oakland, are not common carriers by water. We fully agree that no rate-making power such as the Commission has been given over water carriers is conferred over other persons subject to the Shipping Act. But the order of the Commission, though it pertains to demurrage charges, is not an exercise of conventional rate-making. By § 17 all those who are subject to the Act are under a duty to "establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property." When the Commission finds a breach of this duty, the same section authorizes it to "determine, prescribe, and order enforced a just and reasonable regulation or practice." The withholding of rate-making power for services other than water carriage does not qualify the unlimited grant to the Commission of the power to stop effectively all unjust and unreasonable practices in receiving, handling, storing or delivering property. Finding a wrong which it is duty-bound to remedy, the Maritime Commission, as the expert body established by Congress for safeguarding this specialized aspect of the national interest, may, within the general framework of the Shipping Act, fashion the tools for so doing. Cf. *United States Navigation Co.* v. *Cunard S. S. Co.*, 284 U. S. 474, 487; *Merchants Warehouse Co.* v. *United States,* 283 U. S. 501, 513. The only way to correct the preferential and unreasonable results of non-compensatory charges was to require compensatory charges. All that the Commission did was to translate that requirement from a generality into dollars and cents. That the phrase

---

tariff, regulation, or practice, demanded, charged, collected, or observed by such carrier is unjust or unreasonable, it may determine, prescribe, and order enforced a just and reasonable maximum rate, fare, or charge, or a just and reasonable classification, tariff, regulation, or practice." c. 451, 39 Stat. 735, Ex. Ord. No. 6166, c. 858, 49 Stat. 1987, 2016, 46 U. S. C. § 817.

"regulation or practice" extends to such discrimination as that which resulted from non-compensatory demurrage charges is amply demonstrated by the application of the concept "practice" in comparable situations under the Interstate Commerce Act. *Adams* v. *Mills,* 286 U. S. 397, 409; *Baltimore & Ohio R. Co.* v. *United States,* 305 U. S. 507, 524.

We have disposed of the only serious question raised. The numerous other questions call for only summary treatment.

Since Oakland and California are not common carriers by water they are subject to the authority of the Commission only if they come within the designation "other person subject to this Act" as defined in § 1 of the Shipping Act. c. 451, 39 Stat. 728, c. 152, 40 Stat. 900, 46 U. S. C. § 801. The phrase covers "any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water." And "person" "includes corporations, partnerships, and associations . . ." We need not waste time on useless generalities about statutory construction in order to conclude that entities other than technical corporations, partnerships and associations are "included" among the "persons" to whom the Shipping Act applies if its plain purposes preclude their exclusion. The crucial question is whether the statute, read in the light of the circumstances that gave rise to its enactment and for which it was designed, applies also to public owners of wharves and piers. California and Oakland furnished precisely the facilities subject to regulation under the Act, and with so large a portion of the nation's dock facilities, as Congress knew (53 Cong. Rec. 8276), owned or controlled by public instrumentalities, it would have defeated the very purpose for which Congress framed the scheme for regulating waterfront terminals to exempt

those operated by governmental agencies. We need not rest on inference to avoid a construction that would have such dislocating consequences. The manager of the bill which became the Shipping Act of 1916, speaking on the floor of the House, left no doubt that the legislation was designed to prevent discrimination no less by public than by private owners. 53 Cong. Rec. 8276. And whatever may be the limitations implied by the phrase "in connection with a common carrier by water" which modifies the grant of jurisdiction over those furnishing "wharfage, dock, warehouse, or other terminal facilities," there can be no doubt that wharf storage facilities provided at shipside for cargo which has been unloaded from water carriers are subject to regulation by the Commission. Finally, it is too late in the day to question the power of Congress under the Commerce Clause to regulate such an essential part of interstate and foreign trade as the activities and instrumentalities which were here authorized to be regulated by the Commission, whether they be the activities and instrumentalities of private persons or of public agencies. *United States* v. *California,* 297 U. S. 175, 184–5.

Due consideration has been given to other objections, referring to the sufficiency of the evidence before the Commission, the adequacy of its findings, and its competence, but they require no discussion.

*Affirmed.*

MR. JUSTICE ROBERTS:

I dissent. I pass the contentions of the appellants respecting the power of Congress to regulate the State's activities under consideration, the scope of the term "person" as used in the Shipping Act, and the alleged absence of any grant of power to the Commission to fix minimum rates for water carriers or others. This for the reason that, in my opinion, Congress has withheld from the Com-

mission authority to fix or regulate the rates or charges of those furnishing wharfage facilities.

The Shipping Act of 1916, in all parts here relevant, has remained as it was originally adopted, though amended in other respects by later legislation. In § 1,[1] after defining carriers by water, which are the primary subject of its regulatory provisions, the Act adds:

"The term 'other person subject to this Act' means any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water."

Section 16[2] provides:

"That it shall be unlawful *for any common carrier by water, or other person subject to this Act,* either alone or in conjunction with any other person, directly or indirectly—

"First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." [Italics supplied.]

Section 17,[3] in pertinent part, provides:

"*No common carrier by water in foreign commerce* shall demand, charge, or collect *any rate, fare, or charge which is unjustly discriminatory between shippers or ports,* or unjustly prejudicial to exporters of the United States as compared with their foreign competitors. Whenever the commission finds that any such rate, fare, or charge is demanded, charged, or collected it may alter the same to the extent necessary to correct such unjust discrimination

---

[1] 46 U. S. C. 801.
[2] 46 U. S. C. 815.
[3] 46 U. S. C. 816.

or prejudice and make an order that the carrier shall discontinue demanding, charging, or collecting any such unjustly discriminatory or prejudicial *rate, fare, or charge.* [Italics supplied.]

"*Every such carrier and every other person subject to this Act* shall establish, observe, and enforce just and reasonable *regulations and practices* relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the commission finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice." [Italics supplied.]

Section 18,[4] so far as relevant, is:

"*Every common carrier by water in interstate commerce* shall establish, observe, and enforce just and reasonable *rates, fares, charges, classifications, and tariffs,* and *just and reasonable regulations and practices relating thereto* and to the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the carrying of personal, sample, and excess baggage, the facilities for transportation, and all other matters relating to or connected with the receiving, handling, transporting, storing, or delivering of property." [Italics supplied.]

The Commission concedes, as it must, that whereas the Act definitely deals with the rates of water carriers, and places those rates under the regulatory jurisdiction of the Commission, it contains no such specific mandate to the Commission concerning the rates or charges of wharfingers. It must equally be conceded that the order of the Commission under review does establish minimum rates and charges for services rendered by those maintaining and operating wharves used by water carriers. In the absence of specific authority in this behalf, the Commission turned to that portion of § 16 which prohibits not only water carriers but other persons subject to the Act from

---

[4] 46 U. S. C. 817.

granting preferences or practicing discrimination, and that portion of § 17 which comprehends both water carriers and other persons subject to the Act and enjoins just and reasonable regulations and practices respecting receiving, handling, storage or delivery of property.

The oversimplified argument in support of this position is that a rate or charge is, in a broad sense, a regulation or practice. The difficulty with the argument is that, in the Interstate Commerce Act, and elsewhere, Congress has always sharply distinguished, as it did in the present Act, between rates and charges on the one hand, and regulations and practices on the other. The legislative history of the Shipping Act indicates that Congress well understood that states and municipalities, in order to encourage the flow of commerce through their ports, had established public wharves and that Congress intended that, as respects such public facilities, preferences and discriminations should not be permitted. But there is nothing in the legislative history to indicate that, in the teeth of the plain words of the statute as enacted, Congress had in mind conferring power to regulate the rates and charges for such publicly owned facilities; much less that if a state or its agency deemed it advisable and in the public interest to operate such facilities at low rates, to encourage the flow of commerce through its ports, the Commission could put a floor under its rates and compel it in effect to aid competing private enterprise.

Little need be, or can be, added to the clearly expressed words of the statute. It speaks for itself, and I think the court ought not to permit the use of a prohibition against practices to be availed of to write additional provisions into the section dealing with rates and charges.

The attempt to bolster this process, on the part of the Commission, by reference to the decisions of this court seems to me futile. The Commission and the Government rely principally upon *Baltimore & Ohio R. Co.* v.

*United States,* 305 U. S. 507. That case obviously not only fails to support the order but seems to me to be an authority against it. The case arose under the Interstate Commerce Act. It dealt with a practice of carriers which was to maintain warehouses in respect of which low cost storage was afforded to persons who would ship over the carrier's lines. In essence the practice of warehousing at such low rates operated as a rebate or discrimination in the carrier's transportation rate favoring any shipper who would use the carrier's lines and disfavoring those who would not, or could not, do so. Here we are not concerned with water carriers' rates, fares or charges. The Commission's order is directed at services rendered by privately and publicly owned wharves, applicable to all seeking to avail themselves of the services which are proffered to all alike. If any discrimination by the appellants as between shippers were pointed out it may well be that the Commission might order the discontinuance of such discrimination. That is not this case. The Commission purports to order the discontinuance of a discrimination but, in reality, orders a rise in the level of rates applicable without discrimination to all those who can and do use the proffered services. Its order is a thinly veiled attempt to cloak a rate order under the guise of a regulation. I think it plain that Congress granted no such power.

I would reverse the judgment.

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and MR. JUSTICE MURPHY join in this dissent.