**BALTIMORE & O. R. CO. et al.**

v.

**UNITED STATES et al.**
No. 11078.

United States Court of Appeals,
Third Circuit.

Argued Nov. 19, 1953.

Decided Dec. 24, 1953.

Theodore Voorhees, Philadelphia, Pa. (Windsor F. Cousins, Thomas Thatcher, Barnes, Dechert, Price, Myers & Rhoads, A. W. Hesse, Jr., Philadelphia, Pa., L. J. Huegel, Baltimore, Md., on the brief), for petitioner.

Richard W. Kurrus, Washington, D. C. (Stanley N. Barnes, Asst. Atty. Gen., Daniel M. Friedman, Special Asst. to the Atty. Gen., Max E. Halpern, Asst. Gen. Counsel, Washington, D. C., John Mason, Chief, Regulation Branch, Edward Aptaker, Attorney, Federal Maritime Board, Washington, D. C., on the brief), for respondent.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

GOODRICH, Circuit Judge.

This is a petition for review of an order of the Federal Maritime Board which requires the petitioning railroads to increase the duration of "free time" given truckers for removal of waterborne freight from the railroads' Philadelphia piers.[1] Upon the first hearing of the case we vacated the order and returned the matter to the Board for further proceedings because its discussion and findings were not in such form as to permit adequate review. Baltimore and Ohio Railroad v. United States, 3 Cir., 1953, 201 F.2d 795. The opinion of the Board made pursuant to the remand is now before us. And, as should be expected, it is again assailed by the railroads.

Petitioners have repeated their attack upon the jurisdiction of the Board to make an order regulating the time during which freight may be left on the piers without payment of demurrage charges. As we understand it, the railroads' argument is that the Board has no power to make any order at all on this matter since they, the railroads, do not receive, handle, store, or deliver this truck-borne freight and the statute, section 17 of the Shipping Act, 46 U.S. C.A. § 816, talks the language of "receiving, handling, storing, or delivering of property."

But the paragraph of the statute from which these words are quoted applies not only to carriers but to "every other person subject to this chapter." We held, in the opinion cited above, that these railroads were persons subject to the Act. We were supported in this conclusion, we thought and still think, by State of California v. United States, 1944, 320 U.S. 577, 64 S.Ct. 352, 88 L. Ed. 322.

---

1. The case also involves freight trucked to the piers for shipment by water.

The "just and reasonable regulations and practices" which persons subject to the Act must observe are those "relating to or connected with the receiving, handling, storing, or delivering of property." The maintenance of pier facilities by railroads for the loading and unloading of water-borne cargo is an undertaking connected with the handling and delivering of property. We have no doubt of the jurisdiction of the Board under sections 1 and 17 of the Act to enforce the making of reasonable regulations.

The railroads, however, claim that since they own the piers no one else may dictate how they shall be operated. If the railroads want to allow other persons to enter, they may, it is argued, do so under such terms and conditions as they, the owners, are pleased to offer. An analogy is drawn between this right and the right to select a cab company or a bus line to operate from the Pennsylvania Station at 30th Street, Philadelphia.

We shall assume for the purpose of this discussion that the railroads may close their piers if they wish. But they have not closed them, and it is pretty clear that it is not to their interest to do so because they derive patronage from the freight handled by seagoing vessels. And so, when they participate in the business of the transfer of freight between water carriage and land carriage, the railroads come under the terms of the statute.

■ We come, then, to the question whether this order is proper. It is always well to remind ourselves, in one of these cases, that we are not the body on whom rests the responsibility of working out the problem involved, be it pier traffic or something else. In other words, the power of the reviewing court is limited to determining whether the administrative body has acted according to law and whether the conclusions it has reached are supported by the record read as a whole. See Swayne & Hoyt, Ltd. v. United States, 1937, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659; and section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009. As the case now comes before us we think that the findings of fact on the critical points are amply sufficient to support the results reached by the Board. Since they are the heart of this case, we quote them:

"5. Respondents' piers for the most part are old wooden structures of the finger type, erected before the widespread use of large motor trucks and trailers. Their design is adopted primarily for the interchange of freight between vessels and railroad cars. Motor vehicles must be driven inside the pier sheds to load or unload freight from the floor. Some of the piers are double-decked and equipped with elevators or cargo chutes. In some cases, although there are two lanes of driveway, crossbeams and columns prevent two vehicles from passing through the pier at the same time. Ordinarily each trucking company is prohibited from placing more than one truck on a pier at one time. On some double-decked piers, only one chute is used at a time, making it necessary for trucks to wait in turn, thus causing delay. Truck cargoes are loaded and unloaded by truck company employees, and rail cargoes by railroad employees. Frequently, it is necessary for truckers to interrupt their work and move aside to permit rail car-loading and unloading. Sometimes a trucker will arrive at the pier and find that his shipment is boxed in by other piles of freight, and hence inaccessible until the other piles are removed, also causing delay and congestion.

"6. The two-day, free-time period tends to cause the trucks to converge on the piers at the same time. Thus, at times, as many as ten to twenty trucks may be waiting to enter a pier. The resulting waiting periods range from a half hour to five hours. After trucks have been

loaded, they may have to wait up to two hours to get off the pier."

In a further finding the Board states that:

"10. As a result of the above conditions, substantial quantities of inbound and outbound cargo cannot be handled within the two-day free time period. Several trucker witnesses estimated that in not over 40 percent of the shipments handled by them could all the cargo be removed from the pier within the two-day period. The figures submitted by respondent Pennsylvania Railroad Company show that during a nine-month period in 1950, 66 percent of all outbound and inbound truck freight moving across its piers, including foreign and domestic traffic, was removed within free time. Figures of respondent The Baltimore and Ohio Railroad Company show that for the year 1949, 59 percent of its truck cargo was removed within free time, and that, in the first six months of 1950, 64 percent of its truck cargo was so removed. The figures of respondent The Reading Company show that in the first seven months of 1949, approximately 80 percent of its truck cargo was removed within free time. Respondents' statistics, however, show percentages based on weight of traffic moving across the piers and do not necessarily reflect the frequency of the incurring of demurrage."

What should be the solution of the problem created by these facts, which are not seriously challenged by any of the railroads concerned? The railroads say that increasing free time will simply increase congestion and take off the pressure to remove the freight. But the findings indicate that because of the nature of the piers (and no doubt the amount of business done) material cannot be moved in two days. The railroads emphasize the point that much of the difficulty is caused by the delay in wool shipments, which are bulky and which take additional time because of necessary government inspection. The railroads are not responsible for delays which are occasioned by such inspection. Free Time and Demurrage Charges at New York, 3 U.S.M.C. 89 (1948). But the testimony about pier conditions came from truckers who did not confine their operations to wool hauling; for example, seed, twine, canned goods, toys, paper and coffee were also handled by them. The evidence shows that wool accounted for only 48,364 tons of the 11,337,011 tons of Philadelphia imports during six months of 1950.

So the case gets down to this. Pier congestion is largely caused by the type of pier, which slows up the handling of business for everyone. Under the statute the Board has authority to make reasonable rules and regulations. On the basis of the evidence before it, the Board has concluded that an increase in free time is required in order that reasonable provision may be made for deposit and removal of cargo. Although the railroads do not bring in freight by water, nevertheless in furnishing pier facilities they have brought themselves under the statute. An administrative body with jurisdiction has made an order. We think this is a case in which the order is of a kind peculiarly within the responsibility of that body. Its responsibility is comparable to that of the National Labor Relations Board in deciding upon the proper remedy for unlawful practices. In neither event should a court interfere unless the administrative body has acted without authority of law or unless its order is so inappropriate as to be an abuse of discretion. We do not so find here.

The railroads also contend that the record does not support the application of the order to export freight, domestic cargo, and long-haul freight. We do not agree. Three witnesses testified to the difficulties of delivering export freight to the piers within two days of sailing. There was conflicting testimony on the possibilities of handling domestic cargo within that period. So far as we can

ascertain, no suggestion was made to the Board that the factors affecting free time for long-haul freight differ from those governing local freight. We think, therefore, that the inclusion of all these types of freight in the order is warranted.

Again, the railroads claim that the order as it now stands favors truck freight over rail freight. It is true that local rail freight is allowed only two days free time. But there is evidence that rail freight is more quickly removable from this type of pier than truck freight. As explained above, these piers were built to facilitate the removal of cargo from ship to railroad car. A difference between time allowed for truck freight and railroad freight is based on a difference in circumstances attending removal. Finally, there can be no claim of discrimination against long-haul rail freight since it receives five days free time, just as truck freight does.

The order of the Board will be affirmed.