385 F.2d 678
 128 U.S.App.D.C. 156
 The CITY OF LOS ANGELES, San Francisco Port Authority, and
Encinal Terminals, Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents.
Sea-Land Service, Inc., Sea-Land of California, Inc., City
of Oakland, California, City of Long Beach,
California, Intervenors.
 No. 20025.
 United States Court of Appeals District of Columbia Circuit.
 Argued June 5, 1967.
Decided Sept. 15, 1967.
 
 Mr. Walter C. Foster, Los Angeles, Cal., with whom Messrs. Edward C. Farrell, Los Angeles, Cal., and Robert Fremlin, San Francisco, Cal., were on the brief, for petitioner.
 Mr. Walter H. Mayo, III, Atty., Federal Maritime Commission, with whom Asst. Atty. Gen. Donald F. Turner, Messrs. James L. Pimper, Gen. Counsel, Robert N. Katz, Sol., Federal Maritime Commission, and Irwin A. Seibel, Atty., Dept. of Justice, were on the brief, for respondents.
 Mr. J. Kerwin Rooney, Atty. for intervenor City of Oakland, Cal., argued on behalf of all intervenors.
 Mr. Sterling F. Stoudenmier, Jr., Mobile, Ala., was on the brief for intervenors Sea-Land of California, Inc. and Sea-Land Service, Inc.
 Mr. Leslie E. Still, Jr., Long Beach, Cal., was on the brief for intervenor City of Long Beach, Cal.
 Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.
 LEVENTHAL, Circuit Judge:
 
 
 1
 Following an evidentiary hearing, the Federal Maritime Commission approved an agreement between the Port of Oakland, California and Sea-Land of California, intervenors here, covering the cost of a perferential assignment of dock and wharfage facilities and related services at the Port of Oakland.[1] Petitioners, competing California ports, challenge the agreement as violative of the governing provisions of Sections 15, 16 and 17 of the Shipping Act of 1916, 46 U.S.C. 814, 815 and 816. On the record before us, we affirm the Commission's order although, as will appear, we do not immunize the agreement from further scrutiny in the event additional administrative proceedings are instituted.
 
 
 2
 Sea-Land is a common carrier operatiing on the intercoastal route between ports in California and Elizabeth, New Jersey with an en-route call at Puerto Rico on eastbound voyages. As opposed to conventional break-bulk operations, Sea-Land operates ships capable of carrying hundreds of containers which are pre-packed at the point of origin, shipped via surface transportation to dockside, crane loaded onto its vessels fro the intercoastal voyage, and offloaded for ground fransportation to the ultimate destination. The convenience of this service and the attractive shipping rates offered have made Sea-Land's operations successful.
 
 
 3
 In late 1964, Sea-Land decided to place additional vessels in intercoastal service and enlarge each ship's cargo capacity by removing ship-based loading cranes and relying instead on shore-based supporting equipment. Sea-Land contracted various California ports and outlined its requirements which contemplated the use of expensive shore-based loading cranes. Following extensive negotiations, Oakland agreed to purchase the cranes at a cost of over two million dollars and to assign to Sea-Land two docking berths on a preferential basis.[2] To finance the purchase of the cranes, Oakland issued municipal bonds. In return, Sea-Land agreed to pay Oakland the applicable tariff rates for these and other needed facilities and services subject, however, to an annual minimum charge of $450,000 and an annual ceiling of $550,000. The agreement, which has a twenty-year life, was reduced to writing and filed with the Commission.[3]
 
 
 4
 * To put the issues in proper perspective, it is helpful to sketch the impact of the Shipping Act on port operations and agreements such as are involved in this case. Section 1 of the Act, 46 U.S.C. 801, defines 'other person subject to this chapter' to include those 'carrying on the business of * * * furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water.' In 1940, the Commission's predecessor held that a port operated by a state was an 'other person' within the meaning of the Act. Wharfage Charges and Practices at Boston, 2 U.S.M.C. 245, 246-247 (1940). The following year, that ruling was applied in a proceeding instituted to determine whether the practices of terminal operators in the San Francisco Bay Area were unlawful. Practices Etc. of San Francisco Bay Terminals, 2 U.S.M.C. 588 (1941). There, following exhaustive hearings, the Commission found a series of practices unlawful and entered a sweeping remedial order which included the establishment of minimum charges for specified services and obligated the ports to file information copies of their tariffs with the Commission.[4]
 
 
 5
 The Commission's order was vigorously, but unsuccessfully, challenged in the courts. State of California v. United States, 46 F.Supp. 474 (N.D.Calif.1942), aff'd. 320 U.S. 577, 64 S.Ct. 352, 88 L.Ed. 322 (1944). From this litigation emerged the principle that, although the Commission has no rate-making power such as has been conferred on it with respect to common carriers,[5] it has an obligation to insure that ports 'establish, observe, and enforce just and reasonable regulations and practices,' see Section 17, 46 U.S.C. 816, and that no port makes or gives 'any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic.' See Section 16, 46 U.S.C. 815. Agreements between ports and shippers which are subject to Section 15 of the Act must be submitted to the Commission.[6] The Commission is authorized to 'disapprove, cancel, or modify' any such agreement which it finds 'to be unjustly discriminatory or unfair * * * or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter * * *' and it must approve all other agreements.
 
 
 6
 With these general propositions in mind, we turn to the agreement before us.
 
 II
 
 7
 Petitioners' principal argument is that any agreement for the use of terminal facilities at a rate computed other than in accordance with the applicable tariff is unlawful. Although the Commission views such agreements with healthy skepticism, it has heretofore declined to construe the Shipping Act to erect an absolute ban on so-called minimum-maximum agreements.[7] In this case, it adhered to that rule holding:
 
 
 8
 * * * since compensation for the use of terminal facilities in a minimum-maximum rather than straight tariff form is not in itself unlawful, there must be some showing of an unreasonable disadvantage among the users of the facilities on these different bases before a minimum-maximum compensation can be declared contrary to section 17, and 16 itself requires a showing of such unreasonable disadvantage.[8]
 
 
 9
 Thus, the issue on this branch of the case is whether an agreement is per se 'unjustly discriminatory or unfair,' or otherwise in 'violation of this chapter,' i.e., in violation of Section 16 or 17, merely because the parties calculate compensation in a manner other than by strict application of the tariff.
 
 
 10
 While an agency's construction of its statute is not binding on the courts, that construction is entitled to great weight.[9] Petitioners must shoulder the burden of persuading us that the body charged by Congress with the day-to-day administration of the Shipping Act has deviated from or ignored an ascertainable legislative intention. This, they have not done.
 
 
 11
 The tariff filed by a port is significantly different from the tariff filed by a common carrier. With respect to the former, the Commission is only authorized to halt rates or practices which are unreasonable or discriminatory. Subject to its limited power to translate these statutory prohibitions into 'dollars and cents' terms by establishing a maximum or minimum rate,[10] the Commission has no rate making power with respect to ports. The situation is much different with respect to common carriers, for Section 18 of the Act, 46 U.S.C. 817, explicitly gives the power to establish the rates to be charged and the carrier is obligated to abide by its effective tariff without exception on pain of criminal fines. We are not prepared to say that the Commission was required to do what Congress has refrained from doing, and to expand Section 18 so as to include ports.
 
 
 12
 Moreover, in the absence of an ascertainable direction by Congress to the contrary, we cannot say that the Commission's conclusion may not embody a sound, or at least reasonable, judgment. Sea-Land's rapid operation, using a shore-based loading crane, requires facilities and services different from those utilized by conventional break bulk vessels calling at ports. We do not think Congress wrote such an inflexible statute that the Commission is barred from taking into account such differences as justification for a difference in rate, or to require that what are essentially unique arrangements must be published in the form of a tariff-- at least where, as here, the agency has a stated policy of subjecting applications that a special situation be governed by a particular agreement rather than a general tariff to the full airing of an evidentiary hearing before according its approval.[11] At such a hearing, the full facts and circumstances may be developed and the Commission may determine whether or not to approve the different rates and charges, subject always to the Act's ban on unreasonable or discriminatory practices. Any particular agreement departing from tariff rates may run afoul of the Act, but we are not willing to say that all do as a matter of law.[12]
 
 III
 
 13
 Petitioners also argue that this particular agreement 'does not include all of the elements of direct and indirect wharfinger costs which should be allocated to (the Sea-Land agreement) and is therefore noncompensatory.' This, of course, stirs issues quite distinct from the statutory broadside which we have already considered and rejected. We may assume, and neither the Commission nor intervenors argue otherwise, that an agreement which fails to allocate a fair share of the port's overhead expenses might be noncompensatory and thereby unreasonable, unjust and discriminatory within the meaning of the Act. Additionally, failure to properly allocate expenses reflects on the overall rate of return projection on which the Commission's approval rests.
 
 
 14
 Petitioners' main argument on this branch of the case seems to be directed to the proposition that Oakland did not compute its costs in line with the socalled Freas Formula. Under that formula, the port's entire overhead costs and expenses are taken into consideration in fixing the applicable charge.[13] Here, as Oakland's Chief Engineer testified, the port segregated the specific terminal facilities to be assigned to Sea-Land and the particular services which Oakland would render pursuant to the agreement and computed its cost of service accordingly. The Commission found no reason to conclude that this method of computing costs did not fairly allocate the cost of providing the service and reflect an accurate rate of return projection upon which a judgment of reasonableness could be based. We have no occasion to disagree.
 
 
 15
 The goal is not slavish adherence to any particular formula, but a method of computation which takes into account the direct and indirect expenses and projects an accurate estimate of the cost of providing the particular service and the rate of return which the port may realize from the particular agreement. Compare Baltimore & O.R. Co. v. United States, 345 U.S. 146, 149-150, 73 S.Ct. 592, 97 L.Ed. 912 (1953); Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 593, 69 S.Ct. 278, 93 L.Ed. 243 (1949); Federal Power Commission v. Hope Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944). If, in a particular case, a port uses a method of calculation other than the Freas Formula and convinces the Commission that its computations accurately reflect the anticipated costs and return, we know of no reason why the Commission may not accept and rely on such calculations.
 
 
 16
 We are made uneasy by petitioners' subsidiary contention that Oakland's calculations excluded 'the non-revenue producing facilities of a port which are used in whole or in part in connection with revenue producing facilities. * * *' Oakland's witness admitted that his figures did not take into account such things as depreciation and improvements on property not directly involved in this agreement, and some general administrative costs. At oral argument, we probed this matter further and it appears that other items of expense, such as might arise from security and weather services, were also excluded from consideration by Oakland. Failure to include such items might reduce significantly the projected rate of return on which the Commission's findings turned, or if might have no appreciable effect.
 
 
 17
 The difficulty we have is that this record contains no evidence as to the actual cost of these non-included items. No doubt petitioners, who fully participated in the hearing, regarded this aspect of the case as a subsidiary or even sub-subsidiary one, and focused their attention in the main to broader issues. The cross-examination of Oakland's witness on this point is reflected in but five pages of the record, and the questions put to him were designed to point up omitted items in an apparent effort to show that nothing but a straight Freas Formula computation could properly be utilized, rather than in an effort to demonstrate that omitted items had a material bearing on the accuracy of Oakland's figures.
 
 
 18
 The relative insignificance that petitioners attached to this point at the administrative level leads us to conclude that they were impliedly conceding that if they were wrong in their contention that the Freas Formula was required, the extra expenses that might be assigned under another allocation technique would not be sufficient in extent to affect the Commission's determination in this particular case. We note that petitioners did not file a motion requesting, in the alternative, a remand to the Commission for the purpose of permitting additional evidence to be adduced. Cf. 28 U.S.C. 2347(c). We think the interest of justice does not require a remand to clarify the ambiguity of this aspect of the record as a condition of passing on the validity of the order. Taking the record in the posture as we discern it, we see no reason why the order should not be affirmed. See West Ohio Gas Co. v. Public Utilities Commission of Ohio (No. 1), 294 U.S. 63, 76, 55 S.Ct. 316, 79 L.Ed. 761 (1935).
 
 
 19
 The Commission has continuing jurisdiction over this agreement, 46 U.S.C. 824, and may reopen the proceedings either on its own motion or on an appropriate showing from an interested party. Perhaps changed circumstances or additional evidence would lead the Commission to reconsider its approval and to disapprove or modify the agreement. Certainly nothing we have said precludes that possibility and we decline to assume that the Commission would not lend a receptive ear to any future showing that continuance of this agreement is not in accord with the policy considerations and express limitations of the Shipping Act. Because such reevaluation is a continuing possibility and because, on this record, we have no warrant to overturn the Commission's findings, we affirm its order.
 
 
 20
 Affirmed.
 
 
 
 [1]
 Agreement No. T-1768: Terminal Lease Agreement, 9 F.M.C. 202 (1966). Additional facts are set forth in the Commission's opinion and we have not attempted to detail all the circumstances surrounding the agreement in this opinion
 
 
 [2]
 A preferential assignment is one whereby the assignee obtains first-call rights to a particular facility when its vessels are in port but which permits the operator to assign the facility to other users when not actually in use by the assignee
 
 
 [3]
 An earlier agreement between Oakland and Sea-Land had been approved by the Commission. Agreement No. T-5: Terminal Lease at Oakland, California, 8 F.M.C. 521 (1965). That agreement was cancelled simultaneously with the implementation of the present agreement
 
 
 [4]
 See 46 C.F.R. Part 533 (1966), the validity of which was recently upheld with respect to rail carriers owning or controlling port terminal facilities in Alabama Great Southern R. Co. v. Federal Maritime Commission, 126 U.S.App.D.C. 323, 379 F.2d 100 (1967)
 
 
 [5]
 46 U.S.C. 817. See California v. United States, 320 U.S. 577, 64 S.Ct. 352 (1944)
 
 
 [6]
 Section 15 of the Act requires the filing of agreements which, inter alia, establish special rates, accommodations, or other special privileges or advantages, or provide for an exclusive, preferential, or cooperative working arrangement
 
 
 [7]
 The Commission has succinctly stated its rule: 'An agreement for the use of a public terminal facility at a rental which deviates from the terminal's regular tariff provisions, may run afoul of the Shipping Act's proscriptions and is deserving of our scrutiny for any illegal discrimination or prejudice that may result. Such an agreement, however, is not unlawful or unreasonable merely because it does not follow the terminal's tariff charges.' Agreement No. 8905-- Port of Seattle and Alaska S.S. Co., 7 F.M.C. 792, 800 (1964)
 
 
 [8]
 The trial examiner had ruled that petitioners lack 'standing' to raise any claimed illegality under Section 16 on the theory that a competitive relationship between Sea-Land and the competing ports must be shown. We note that subsequent to its decision in this case, the Commission comprehensively analyzed the 'standing' problem with respect to Section 16 litigation and overruled the older cases which required a showing of competitive disadvantage as a condition precedent to litigation of a Section 16 claim. Investigation of Free Time Practices-- Port of San Diego, 9 F.M.C. 525, 544-547 (1966). However, as we read the Commission's opinion in this case, the Section 16 issues were decided on the merits, and we find it unnecessary to pass on the standing problems
 
 
 [9]
 E.g., Udall v. Tallman, 380 U.S. 1, 16-18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)
 
 
 [10]
 State of California v. United States, supra, 320 U.S. at 584, 64 S.Ct. at 356
 
 
 [11]
 It is precisely this disclosure and Commission review that distinguishes statutory violations such as those involved in Storage Practices at Long View, Washington, 6 F.M.B. 178 (1960)
 
 
 [12]
 Petitioners also point to a provision in the 'California Association of Port Authorities Agreement,' to which Oakland is a party, requiring all ports to observe their effective tariffs. It is argued that Oakland was 'rewarded by receiving Commission approval of their breach' of this agreement. The Commission considered this matter and concluded that the agreement was not violated. We are not now called upon to consider what if any steps might properly be taken should the California courts disagree with the Commission in this matter
 
 
 [13]
 See Terminal Rate Structure-- California Ports, 3 U.S.M.C. 57 (1948); Investigation of Wharfage Charges on Bulk Grain at Pacific Coast Ports, 8 F.M.C. 653 (1965)