**VOLKSWAGENWERK AKTIENGE-SELLSCHAFT, Petitioner,**

v.

**FEDERAL MARITIME COMMISSION**
**and**

**United States of America, Respondents,**
**Pacific Maritime Association, Marine Terminals Corporation, Intervenors.**

**No. 19840.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 10, 1966.

Decided Dec. 22, 1966.

748

Mr. Walter Herzfeld, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Richard A. Whiting and Robert J. Corber, Washington, D. C., were on the brief, for petitioner.

Mr. Walter H. Mayo, III, Attorney, Federal Maritime Commission, with whom Asst. Atty. Gen. Donald F. Turner, Messrs. James L. Pimper, General Coun-

sel, Robert N. Katz, Solicitor, Federal Maritime Commission, and Irwin A. Seibel, Attorney, Department of Justice, were on the brief, for respondents.

Mr. Gary J. Torre, San Francisco, Cal., of the bar of the Supreme Court of California, pro hac vice, by special leave of court, with whom Mr. Edward D. Ransom, San Francisco, Cal., was on the brief, for intervenor, Pacific Maritime Association.

Mr. Arthur R. Albrecht, San Francisco, Cal., entered an appearance for intervenor, Marine Terminals Corporation.

Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

PER CURIAM:

This case is before this court on a petition to review and set aside an order of the Federal Maritime Commission. Petitioner is a German corporation which manufactures Volkswagen automobiles. It ships large quantities of automobiles to ports on the Pacific Coast by means of common carrier and chartered vessels. Marine Terminals Corporation [hereinafter MTC], respondent below, intervenor here, operates ocean terminals at San Francisco and Long Beach, California, where it provides stevedoring services for both common carriers and charter vessels. Pacific Maritime Association [hereinafter PMA], intervenor below and before this court, is a nonprofit corporation made up of common and contract carriers, marine terminal operators, and stevedore contractors. PMA was organized in 1949 for the purpose of negotiating and administering labor contracts with labor unions on behalf of its members. MTC is a member of PMA; Volkswagen is not, since shippers are not eligible for membership in the organization.

I.

In order to understand the present controversy between the parties, it is necessary to review briefly the origins of their dispute. As noted, PMA serves as the collective bargaining representative for its members. In 1957 the members desired to introduce work-saving devices into the industry and to be free of strikes and slowdowns during the period of transformation to greater mechanization. In its capacity as the representative of longshoremen and marine clerks, the International Longshoremen's and Warehousemen's Union [hereinafter ILWU] desired assurances from PMA that its members would share in the monetary benefits realized from the introduction of work-saving devices.

As a result of extensive negotiations between PMA and ILWU, a "Mechanization and Modernization Fund" of $29,000,000 was agreed upon. This fund was to be collected over a nearly six-year period from PMA members and to be used to cushion the effects of higher production upon longshoremen and marine clerks displaced by the mechanization. Since PMA's membership was responsible for payment of the fund, the ILWU agreed to allow PMA to be sole determiner as to how the fund should be accumulated. The necessity for the fund itself is not here in controversy; in fact, all parties agree that it serves a salutary purpose. What is in controversy is the funding method approved by PMA to raise the money from its members.

In order to determine how its members should be assessed in accumulating the fund, a Work Improvement Fund Committee was appointed by PMA. The majority of the Committee recommended that members should be assessed on the basis of tonnage carried or handled, with bulk cargo being assessed one-fifth the rate of general cargo.[1] The rate for general cargo was set at 27½¢ per ton carried or handled; the special category of bulk cargo was to be assessed at 5½¢ per ton carried or handled. Each member of PMA was to remit to PMA, as trustee for the fund, an amount equal to the per tonnage assessment, a ton constituting for the purposes of the assessment 2000 pounds weight, or 40 cubic feet measurement.

1. In adopting the majority report, a minority report recommending that a combined man-hours—tonnage method of assessment should be used was rejected.

The Committee recommended that the assessment be based on the cargo "as manifested" for loading or discharging at Pacific Coast ports. Usually any particular type of cargo is manifested, consistently, either on a weight or measurement basis. Thus the amount of the assessment for any particular commodity would be directly related to whether that commodity was manifested by weight or measurement tons.

There is no uniform way of manifesting automobiles. In the foreign trades they are manifested on a unit basis on chartered ships, but weight and sometimes measurement is shown (the unit price including costs, overhead and profit to the terminal operator, as well as an assessment for PMA dues.) On common carriers both weight and measurement are shown. Tariffs are on a unit basis but dependent upon measurement. In the coastwise trades, autos are manifested and freighted by weight.

Despite the fact that automobiles were manifested in these different ways, PMA determined that automobiles should always be assessed for the mechanization fund on a measurement ton basis regardless of how they were manifested. This treatment of automobiles was in contradistinction to all other cargo which was assessed according to the manner in which it was manifested.

## II.

Cast against this background, Volkswagen's grievance comes into sharper focus. If considered on a measurement ton basis, a Volkswagen automobile measures 8.7 tons, whereas if a weight ton basis is utilized, it measures only 0.9 tons. An assessment for the fund based on measurement tons at 27½¢ per ton equals $2.35 per automobile; the same assessment based on weight tons equals $.25. Thus the utilization of the measurement ton as the standard results in an assessment more than ten times greater than if the weight ton were to be used.

Volkswagen promptly protested to PMA the "discriminatory burden" imposed upon automobiles in general and Volkswagens in particular. Since this make of automobile constitutes by far the largest number of automobiles imported through Pacific Coast ports, the "ten times heavier tax," it argued, was in fact an excessive tax on Volkswagens. In addition, Volkswagen protested favorable treatment accorded by PMA to scrap metal and lumber cargo which were relieved of paying a major part of the assessment by virtue of "depressed" conditions in these industries. Petitioner also argued that the "tax" was particularly inequitable as applied to its operations since, because of previous modernization made in the handling of automobiles, no substantial savings could be expected in the handling of Volkswagens as a result of the institution of the mechanization fund. Petitioner's arguments to PMA were to no avail; Volkswagen has, however, refused to pay the assessment as calculated on a measurement ton basis.

Volkswagen's refusal to pay the assessments on its automobiles prevented the terminal operators (and particularly MTC) from paying to the PMA fund the assessments due on this cargo. It was both theoretically and practically impossible for the terminal and stevedoring companies to absorb the 27½¢ per ton assessment on automobile cargo ($2.35 per auto) since their profit per automobile does not exceed $1.00. MTC sought advice from PMA as to what "stand we can take in demanding payment of the assessment." MTC requested PMA's Board of Directors for authority "to bring suit against Volkswagen for the monies due." Rather than have MTC sue Volkswagen directly, however, it was determined by PMA that it would sue MTC and the other onshore operators engaged in discharging Volkswagen automobiles and they would in turn implead Volkswagen. PMA did bring suit against MTC in the United States District Court for the Northern District of California; when Volkswagen was impleaded by MTC, the District Court stayed the proceedings in that court at the request of Volkswagen to enable it to institute proceedings before the Federal Maritime Commission under the Shipping Act of 1916, amended, 46 U.S.C. § 801 et seq. (1961). The dis-

trict court granted the stay and petitioner began these proceedings.

The following issues were submitted to the Commission for its determination:

"1. Whether the assessments claimed from [Volkswagen] are being claimed pursuant to an agreement or understanding which is required to be filed with and approved by the Federal Maritime Commission under Section 15 [2] of the Shipping Act, 1916, as amended, 46 U.S.C. 814 (1961), before it is lawful to take any action thereunder, which agreement has not been so filed and approved.

2. Whether the assessments claimed from [Volkswagen] result in subjecting the automobile cargoes of [Volkswagen] to undue or unreasonable prejudice or disadvantage in violation of Section 16 of the Shipping Act, 1916, as amended, 46 U.S.C. 815.[3]

3. Whether the assessments claimed from [Volkswagen] constitutes an unjust and unreasonable practice in violation of Section 17 * * *." [4]

Subsequently hearings were held, and the Examiner issued his initial decision finding, *inter alia*, that MTC and PMA were persons subject to the Shipping Act and that the agreement entered into between MTC and other PMA members was a "cooperative working arrangement." The examiner went on to find, however,

2. Section 15, 46 U.S.C., section 814.

\* \* \* \* \*

Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.

The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications or cancellations.

\* \* \* \* \*

Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.

3. Section 16, 46 U.S.C., section 815.

\* \* \* \* \*

It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—

First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

4. Section 17, 46 U.S.C., section 816.

\* \* \* \* \*

Every such carrier and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the Board finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice.

that the cooperative working arrangement between MTC and the other members of PMA was not such an arrangement required by Section 15 of the Shipping Act to be filed with and approved by the Federal Maritime Commission. The Examiner also found no violation of Section 16 or 17 of the Shipping Act.

Before the Commission, both MTC and PMA contested its jurisdiction, MTC arguing that they were not "other persons" under Section 1 of the Act [5] and PMA arguing that the exclusive jurisdiction given the National Labor Relations Board over collective bargaining precluded the Commission from having jurisdiction in the instant case. The Commission did not resolve the jurisdictional question, but rather assumed for the purposes of its decision that both MTC and PMA were subject to the Act. Even though it found the literal language of Section 15 broad enough to encompass any "cooperative working arrangement" entered into by persons subject to the Act, the majority of the Commission held Section 15 inapplicable to PMA's agreements regarding the mechanization fund because it interprets that section to apply

> "only to those agreements involving practices which affect that competition which in the absence of the agreement would exist between the parties when dealing with the shipping or traveling public or their representatives."

The agreement among the members of PMA, the Commission found, was not, standing alone, such an agreement that would affect competition by parties in vying to serve outsiders who are not parties to the agreement. In order to find a Section 15 agreement, the Commission held that there must be demonstrated that there was "an additional

agreement among the PMA membership to pass on all or a part of its assessments to the carriers and shippers served by the terminal operators." The Commission determined, however, that the "record is devoid of evidence showing the existence of such an additional agreement."

The two dissenting Commissioners did not agree with the majority members on this point, arguing that Section 15 requires that the agreement in question should have been filed with the Commission.

The Commission further found that no violation of Section 16 existed because petitioner had failed to show that cargo competitive with its automobiles (id est, other automobiles) had been preferred. As for Section 17, the Commission, although noting that MTC conceded that "the method of assessment against automobiles on a tonnage basis is unfair," found no "unreasonable practice" because "there is no statutory requirement that all users of a facility be assessed equally."

### III.

Petitioner argues ably and earnestly before this court that the Commission has erred in approving the agreements involved in this case. It charges that PMA is dominated by liner interests and that the discriminatory "tax" on Volkswagen automobiles has been meted out to transfer to Volkswagen the financial burden which liner cargo should be carrying. It argues that the PMA committees set up to implement the funding of the mechanization fund are controlled by the shipping lines who are members of PMA and that the decision regarding how heavily automobiles should contribute to the fund always lay with these shipping lines.[6] Since over seventy per cent of

---

5. The term "other person subject to this chapter" means any person not included in the term "common carrier by water," carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water. 46 U.S.C. § 801.

6. It is interesting to note in this regard that under PMA's by-laws, its carrier membership have a majority on its Board of Directors and the controlling vote at membership meetings. In addition, carriers furnish all the members of both the PMA committee appointed to consider how the cost of the mechanization fund

Volkswagen's automobiles arrive by chartered vessel (non-PMA members) and many of the remainder are carried by liners not members of PMA, the higher automobile tax falls heaviest on Volkswagen and serves to lessen the amount of assessment on other general cargo carried by the shipping lines who are PMA members. Volkswagen charges that PMA is attempting to utilize automobile cargo, which the liner interests do not in the main carry, to subsidize other forms of cargo carried by the liner interests. Volkswagen further charges that on all cargo loaded or discharged on behalf of PMA's carrier members, the carrier member must bear the cost of the mechanization fund payments; however, on cargo arriving by chartered vessel (such as seventy per cent of Volkswagen), the burden of the tax falls upon the non-PMA member shipper (Volkswagen). Thus it is to the financial advantage of PMA liner members to place a disproportionately heavy assessment on automobiles.

With respect to the question of whether there was an agreement in this case under Section 15, petitioner argues that the collective action engaged in by the members of PMA as embodied in its agreements is exactly the type conduct which Congress intended to regulate when it passed the Shipping Act. It states that Section 15 requires the filing and approval of *every* agreement, by which is meant as well an "understanding," falling into one of seven categories enumerated in the Act. (See note 2, *supra.*) Included in these categories is any agreement

"fixing or regulating transportation rates or fares; * * * controlling, regulating, preventing, or destroying competition; * * * or in any manner providing for an exclusive, preferential, or cooperative working arrangement."

Petitioner argues that, giving the statutory language its plain meaning and a reasonable interpretation, the PMA agreements clearly serve to bring about all of these proscribed consequences.

Petitioner also attacks the Commission's holding that a Section 15 agreement must be between parties in competition with one another and its further holding that the agreement must relate to a specific aspect of the competition between them, that is, competition with reference to the "shipping or travelling public or other representatives." Such a reading of the Act is far too narrow, it argues, and all but emasculates the Act as an effective means of regulating congressionally proscribed conduct in the industry. Moreover, the Commission's interpretation serves to remove from the Act's jurisdiction agreements involving persons between whom no competition has ever existed as, for example, an ocean carrier and a freight forwarder, both of whom are subject to the Act.

Finally, petitioner argues with respect to Section 15 that, even if the Commission's construction of the statute were on sound ground, it would still have erred in concluding that such construction left the cooperative working arrangement outside Section 15. As the Commission made plain, it would have found such arrangement within the statute if there were

"an additional agreement by the PMA membership to pass on all or a portion of its assessments to the carriers and shippers served by the terminal operators."

Petitioner attacks the Commission's characterization of the record as being "devoid of evidence" showing the existence of such an additional agreement. It points to the fact that, as a logical and practical matter, it necessarily had to be within the contemplation of the PMA terminal operator members and stevedoring companies that the assess-

should be allocated and the committee subsequently formed to pass upon any inequities resulting from that method. Neither committee included any independent terminal operators or stevedoring con-

tractors. The hearing examiner found "that there is no substantial evidence in the record to support Volkswagen's contention that liner interests dominate PMA."

ment would be passed on to shippers because when MTC and the other PMA members voted the assessments they knew that they could not pay them without increasing their charges to petitioner. The assessments, it is argued, "were agreed to with this as a silent predicate. There was no need to secure explicit agreement regarding action to which there was no alternative." Petitioner further argues that all involved knew that the passing on of the PMA assessment to Volkswagen was an integral part of PMA's program. Thus, when Volkswagen refused to reimburse MTC, PMA made no serious attempt to collect the assessments from MTC nor did it dispute MTC's description of itself as "only a collection agency" in the matter. Petitioner points further to the fact that MTC has never made any payments to PMA on cargo on which Volkswagen has refused to recognize any obligation to pay, although MTC has made all other payments called for by the cooperative working arrangement. This conduct, petitioner argues, demonstrates an "understanding" within the contemplation of Section 15 to pass on the assessments to petitioner.

Petitioner also attacks the Commission's determination that there was no Section 16 violation involved in this case because petitioner had failed to show that cargo in competition with its automobiles had been preferred. Petitioner argues that, although past precedents of the courts and Commission support a "competition" requirement, more recent cases have done away with such a requirement. It argues that the focus of the Commission should be on the fact that the assessment of automobiles based upon measurement tons coupled with favored treatment given other cargo serves to provide other cargo with a "preference and advantage" not granted petitioner, which is undue prejudice in clear violation of the Act.

With respect to Section 17, petitioner argues that the Commission erred in not finding an unreasonable and/or unjust practice by MTC in the execution of the PMA agreement. It faults the Commis-

sion for failing to look at the method for allocating the cost of the fund, and for failing to consider under Section 17 the making of the monthly payments to PMA by the terminal and stevedoring companies. It argues that the cooperative working arrangement among the membership of PMA is, in fact, illegal under the antitrust laws as a price fixing arrangement and therefore necessarily unreasonable under Section 17 and that the arrangement is inequitable because it distributes a common cost in an unfair and unreasonable fashion. Finally, it attacks the Commission's determination that there need only be "substantial benefits" accruing to one against whom a charge is levied, and its decision that it is not necessary that benefits and burdens be directly related.

IV

Before deciding the questions proposed here, reference must be had to the principles which are to guide us in reviewing decisions of an administrative agency such as the Federal Maritime Commission. Our touchstone here has to be the Supreme Court's recent decision in Consolo v. F.M.C., 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966), where the Court, in the course of reversing a decision of this court, spoke at length concerning the meaning of the substantial evidence rule which appellate courts are to apply to decisions of the Federal Maritime Commission. In *Consolo,* the Court stated:

"Section 10(e) of the Administrative Procedure Act * * * gives a reviewing court authority to 'set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, [or] an abuse of discretion * * * [or] (5) unsupported by substantial evidence * * *.' Cf. United States v. Interstate Commerce Comm'n, 91 U.S.App.D.C. 178, 183–84, 198 F.2d 958, 963–64, cert. denied, 344 U.S. 893 [73 S.Ct. 212, 97 L.Ed. 691]. We have defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.' Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 229 [59 S.Ct. 206, 217, 83 L.Ed. 126]. '[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' Labor Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 [59 S.Ct. 501, 505, 83 L.Ed. 660]. This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Labor Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 106 [62 S.Ct. 960, 961, 86 L.Ed. 1305; Keele Hair & Scalp Specialists, Inc. v. FTC [5 Cir.] 275 F.2d 18, 21.

Congress was very deliberate in adopting this standard of review. It frees the reviewing courts of the time-consuming and difficult task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps promote the uniform application of the statute."

Although numerous statements and restatements of the substantial evidence rule as interpreted and applied by federal appellate courts might also be cited, we believe that what was recently said by this court in Philadelphia Television Broadcasting Co. v. F.C.C., 123 U.S.App. D.C. 298, 359 F.2d 282 (March 28, 1966) has particular relevance with respect to the task confronting this court in reviewing the decision of the Commission in the instant case. There we said that

"[t]o sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings."

Deference must also be paid in this case to the Commission's expertise, especially in view of the technical and specialized nature of the subject area over which it has jurisdiction.

Applying these general principles to the specific issues before us in this case, and giving due deference to the expertise of the Commission, we conclude (albeit with some hesitation) that there is substantial evidence in the record considered as a whole to support the Commission's decision. The Commission's conclusion that the funding agreement standing alone does not come within the provisions of Section 15 is a tenable one and not arbitrary or capricious, especially in view of the paucity of dispositive precedent on the question.

The Commission's determination that the record is "devoid of evidence" showing the existence of an additional agreement by the PMA membership to pass on all or a portion of its assessments to the carriers and shippers served by the terminal operators presents a closer question. Petitioner points to a number of factors which tend to demonstrate the existence of such an agreement.[7] In addition, petitioner points out that as a practical and logical matter MTC had no choice but to pass on the cost of the assessment to the shipper since it was compelled to do so by economic necessity. Since MTC and the other terminal op-

---

7. This evidence includes: a telegram from one of the PMA members handling Volkswagens expressing the opinion that the cost could never be assumed by the stevedore companies; a letter from MTC to PMA advising that "there is no way that the contractor could absorb such an increase"; a letter from MTC to PMA in which MTC described itself as "only a collection agency in this matter"; a letter expressing PMA's fears that if Volkswagen received a new rate the Army would demand the same for the transport of its automobiles; an inter-office PMA memo stating that the funding committee did not feel that the then present assessment worked a hardship on the *shipper;* minutes of a PMA meeting expressing the opinion that the money owed was due from Volkswagen and not MTC; the creation of an escrow agreement for payments of funds *on behalf of Volkswagen* (payment to be made by the stevedores).

erators and stevedore companies were members of PMA, and since the logical and necessary consequence of their agreement to make the assessment was that such assessments would have to be passed on to the shippers, it necessarily follows that there was at least a tacit agreement among the terminal operators and stevedore companies that the assessment would be passed on to the shippers. Petitioner, however, is not able to point to any direct testimony establishing that such an agreement was made.

In the face of the evidence relied upon by petitioner and the forceful logic of its argument, the Commission held that

"to hold that a section 15 agreement existed on this record would require us to disregard explicit statements to the contrary as well as actions on the part of both the common carrier members of PMA and respondents inconsistent with the existence of such an agreement."

The question we must decide is whether the record considered as a whole contains substantial evidence to support the Commission's finding. It should be noted that what we are here concerned with presents essentially questions of fact—did the agreement take place, was there an "arrangement" between the parties,

etc. Moreover, questions of credibility are involved since witnesses for PMA affirmatively denied the existence of any such agreement or arrangement, and the Examiner, who had an opportunity to observe the witnesses, found no agreement. In these circumstances, we believe that there is substantial evidence in the record considered as a whole to support the Commission's conclusion. Although we might be inclined to reach a conclusion different from that of the Commission were we considering the question *de novo*, or under a less restricted power of review than that enunciated in *Consolo, supra,* we are bound to give the Commission's decision the benefit of all reasonable inferences and our conclusion in so doing is that the Commission's determination that there was no additional agreement is supported by substantial evidence.

Turning next to Section 17,[8] careful consideration has been given by the court to petitioner's contention that the laying of the mechanization fund assessment on automobiles on a measurement basis rather than the weight basis used on the Volkswagen cargo as manifested is "an unreasonable practice * * * relating to * * * the handling of property" in violation of Section 17 of the Act.[9] The problems of the case under

---

8. Section 16 will be considered, *infra,* since our conclusions with respect to Section 17 have relevance in the resolution of petitioner's claim that it is a victim of discrimination in violation of Section 16. We reject at the outset of our discussion of Section 17 respondent's argument that the issue of the unreasonableness of the charge itself can be entirely ignored because petitioner is charging MTC and not PMA with the violation. The complaint, fairly read, charges all members of PMA —including MTC—with an unreasonable practice in the method of computing the assessment.

9. The Commission's opinion concerning this issue recognized the salient facts relied on by petitioner and disposed of the problem with reasoning discussed, *infra.* The Commission said:

It is true that the assessing of automobiles on a measurement basis results in an assessment ten times as great

as would result from a weight basis, and that although other cargo is assessed as manifested, automobiles are always assessed on a measurement basis. It is further true that although the assessment on a measurement basis for some general cargo items exceeds the amount computed on a weight basis, in no instance is the difference as great as on automobiles, and that as there is little likelihood of mechanical improvement in the method of unloading automobiles, auto shippers will probably receive only general benefits from the fund plan, such as freedom from strikes or slow-down.

However, as complainant admits, there is no statutory requirement that all users of a facility be assessed equally. As long as "substantial benefits" are provided for one against whom a charge is levied, we will not normally declare the charge unlawful. Evans Cooperage

Section 17 are perhaps most clearly focused by adverting to the opinion of the dissenting member of the Commission, who concluded that PMA's entire system of measurement and allocation of this type of labor cost is unjust and unreasonable. In his view the core injustice ensued when PMA adopted the recommendation of a majority of its committee, which recommended a property basis of allocation of the assessment (in accordance with tonnage), whereas only through a labor measure of allocation such as that recommended by the minority (*id est,* man-hours with adjustments for inequities) can the burden of this labor cost become a just cost of business. The property measure, he concluded, opens the door to a singling out of particular traffics or persons for disadvantage, and this, in turn, is possible because PMA's control of the market precludes corrective control by competitive forces.

The majority of the Commission was aware that a minority of PMA's committee recommended that the assessment be based in substantial part on the relative man-hours of the various stevedoring companies involved. Indeed, as the Examiner noted, the first $1,500,000.00 mechanization fund raised by PMA, during 1960, pending the report of the Committee, had been collected on a man-hour basis. However, PMA members complained that this method was unfair, and the majority of the Commission concurred in this conclusion.

Our examination of the PMA Committee report and the reasoning supporting its conclusions leads us to conclude that the assessment was reasonable. It appears that the Committee began by considering the possibility of apportioning the assessment on the basis of who obtained a savings as a result of now-permitted mechanization. An expert of the Bureau of Labor Statistics was engaged to explore the possibility of measuring productivity improvement. The PMA turned away from this approach, partly because it feared that its adoption would help the Union enlarge its later demands and partly because the system was unfeasible due to complexity, including the difficulty of determining which savings were attributable to this or other factors. The Committee felt it to be essential to arrive at a system that would not be excessively burdensome to anyone, yet would be simple in its administration.

In rejecting continuance of the initial man-hours basis,[10] the majority of the Committee reported:

"They were struck by the inequity of a contribution formula based on man-hours which would provide for a decreasing percentage of the total contributions to the Fund by the operators which made greatest use of and received the greatest benefit from the new agreements, and were most contributing to the loss of work opportunity that gave impetus to the Union's demand for the fund and would be invoked in future bargaining as the ground for continuing the Fund."

The Committee was troubled by the inequity of most rewarding with low assessments those who had already mechanized most when it was their past

Co. Inc. v. Board of Commissioners, 6 F.M.C. 415. The fact that the benefits may differ to some extent in both kind and degree is not material. An exception to the above principle might arise if it could be shown that the leviers of a charge imposed it in an unequal fashion because of a design deliberately to burden one of the users of its service more than another.

The assessment here, however, has been levied in its present form because it was necessary in the business judgment of respondents to do so. The reasonableness of respondents' activities is attested to by the additional facts that they have sought to change the method of "Mech" fund [11] assessment on automobiles, have offered to pass on only a part of the assessment, and have levied a part of their dues assessment against Volkswagen for several years upon the same measurement basis without protest.

10. The majority considered that the reasons against continuance of a man-hour basis also militated against partial reliance on this factor, as recommended by the majority.

reduction of work hours that had galvanized the Union into the activities that led to this industry-wide labor cost assessment.

The Committee recommended a formula based on cargo tonnage as a "rough-and-ready" way to divide the cost, admittedly lacking the refinement of the productivity measurement method but also lacking its infeasibility and avoiding the inequity of the man-hour method whereby contributions are in *inverse* proportion to benefits received. It considered that cargo volume though not necessarily proportional was some indicator of stevedoring activities and that administrative simplicity was a cardinal consideration.

The Committee recognized further that there were also objectionable features of the tonnage formula but considered these to be less weighty than the objections inhering in the other formulae. It recommended that the formula be reviewed to prevent the continuation of any hardship or inequity that might develop.

It may be noted that the Union had proposed that a tonnage formula be incorporated in the collective bargaining agreement, but the PMA did not wish to limit its discretion in seeking and determining the most reasonable formula it could devise. Petitioner could presumably have had no complaint if PMA had acquiesced in the Union's demand. The PMA told the Union it wanted flexibility to allocate the labor cost on the basis of tonnage man-hours or both, and the Union agreed to let PMA decide the matter. (PMA also feared a tonnage charge levied under a Union agreement would have a tendency to persist into the next contract.)

■ In view of the foregoing, we cannot say that PMA was unreasonable in arranging for an allocation of this industry labor cost *in accordance with* volume tonnage already in industry use for a portion of PMA's dues. Tonnage dues, based on revenue tons of cargo, had been used for many years by PMA. PMA's function and budget relate primarily to the negotiation and administration of union labor contracts. There was therefore in effect an industry custom and practice for using revenue tonnage for the purpose of allocating sundry labor costs. The mechanization fund is an additional labor cost administered by PMA.

■ Petitioner complains of the inequitable "tax" laid upon it. This use of the word "tax" is forensic rather than analytical, but it calls to mind various decisions which if anything militate against its declaration of arbitrariness. "Administrative convenience and expense in the collection or measurement of the tax" is a valid ground of classification in arranging the incidence of taxation. Southern Coal & Coke Co. v. Carmichael, 301 U.S. 495, 511, 57 S.Ct. 868, 873, 81 L.Ed. 1245 (1937). There is no requirement that for every payment there must be an equal benefit. Houck v. Little River Drainage Dist., 239 U.S. 254, 264–265, 36 S.Ct. 58, 60 L.Ed. 266 (1915).

The Commission's doctrine follows the same line. Thus in Evans Cooperage, Inc. v. Board of Commissioners of the Port of New Orleans, 6 F.M.B. 415 (1961), a city's uniform wharfage charge was upheld, even though applied to cargo transferred from a barge to a vessel moored at a wharf without moving across the wharf, on the ground that "substantial benefits" were provided for the person being charged. The Commission noted that the barge and cargo enjoyed substantial benefits from the services and facilities, that "there can be no precise equivalence between services and charges" and that the service was "reasonably related to the charges."

The Commission upheld the assessments before us, noting the substantial benefits accruing to all cargo from the mechanization agreement. As the Commission noted, this is not to say that the mere existence of substantial benefits permits a tax laid solely on one subclass of the persons benefited. The Commission would presumably agree that the mere existence of the substantial benefits would not immunize an unreasonable classification system or egregious dis-

crimination.[11] It does serve, however, to protect a system, reasonable on its face, that uses a "rough-and-ready" allocation measure, from attack on the ground that it is not precise.

Petitioner seeks to predicate infirmity in the PMA plan on the way it has been disadvantaged by developments subsequent to the original adoption of the PMA plan in January of 1961. In particular, petitioner complains of the interpretation that the tonnage basis of allocation should be based, not on the tonnage shown in the manifest as stated in the January, 1961 resolution, but on measurement tonnage in the case of automobiles. This ruling, announced in February, 1961, cannot be deemed unreasonable. Patently the manifest was not intended to be controlling in the sense of permitting a manifest to reduce assessments merely by referring to cargo on a weight basis, even though this had nothing whatever to do with the way ocean freight was determined—as is the case with petitioner which charters entire vessels. The record contains substantial evidence to show that PMA's January, 1961 resolution was to adopt a plan for allocating charges on the same revenue tonnage basis as had been used in PMA's dues. For general cargo and the bulk of commodities, revenue tons were measurement tons, except for certain bulk commodities manifested on dead weight tons. Treatment of automobiles as governed by measurement tons was merely the application of a 1958 ruling on PMA dues. That ruling in turn was based on industry practices in foreign trade and rejected efforts to report dues on weight basis by companies serving petitioner. Petitioner thereafter recognized and knowingly made reimbursement covering the expenses of its stevedores in paying PMA dues on a measurement ton basis. The interpretation complained of is not unreasonable and it does not render the assessment system unreasonable.

Petitioner stresses that it will receive relatively little benefits under the union agreement as applied with PMA's assessments and that it will incur more than a 20% increase in discharge cost, tenfold the average increase for general cargo. The record made by petitioner is strong—though not as strong as petitioner puts it.[12]

■ We cannot say, however, that the case is such as to require reversal of the order. As already noted, a generally reasonable rule for assessing benefits may be maintained though it produces some instances of burdens wholly disproportionate to benefits.[13]

11. Practices at San Francisco Bay Area Terminals, 2 U.S.M.C. 588, 593, 595–96 (1941), aff'd State of California v. United States, 46 F.Supp. 474 (N.D.Cal.1942), aff'd 320 U.S. 577, 64 S.Ct. 352, 88 L.Ed. 322 (1944). See also Investigation of Certain Storage Practices, 6 F.M.B. 301, 316 (1961); Storage Practices at Longview, Washington, 6 F.M.B.; California Stevedore & Ballast Co. v. Stockton Elevators, Inc., 8 F.M.B. 97 (1964).

12. (1) Thus it appears that Volkswagens are transported on liners (13,672 out of 42,598 units in 1962), and here the increase in discharge cost has been absorbed by the carrier.
   (2) There is at least a question whether and to what extent the increase in stevedoring cost of private carriers may have been offset by decrease in cost of shipping by private carrier due to faster turnaround time.

(3) Another carrier of autos (Matson Transport) was enabled to make substantial saving in discharge cost. Thus automobiles in general may benefit more than petitioner in particular.
(4) The fund may have made it easier for MTC to eliminate a man on dockside.

13. We are not to be taken as closing our eyes to petitioner's claim that it is the target of a combination in restraint of trade, leveled by the common carriers dominating PMA against the hostile economic interest of this large-scale importer of automobiles by private charter. That issue is not for the Commission or the court in this proceeding. It suffices to say that agreements not approved by the Commission are not protected from attack under the antitrust laws. Carnation Co. v. Pacific Westbound Conference, 383 U. S. 213, 932, 86 S.Ct. 781, 15 L.Ed.2d 709, 851 (1966).

**760**

In view of our ruling with respect to Section 17, it is apparent that there is no significant basis for the claim that petitioner is the victim of a discrimination that is unreasonable and hence unlawful under Section 16. Under the circumstances it is not necessary to consider whether and under what circumstances a rate practice that is purely "random" and *hence* inherently discriminatory may be challenged under Section 16 in the absence of a showing that competitive cargo has been preferred. New York Freight Forwarders & Brokers Assoc. v. F.M.C., 337 F.2d 289 (2d Cir. 1964), cert. denied, National Customs Brokers & Forwarders Ass'n v. F.M.C., 380 U.S. 914, 85 S.Ct. 902, 13 L.Ed.2d 800 (1965).